784 S.E.2d 242

Elizabeth L. SNOW (f/k/a Elizabeth S. Bell), Mark S. Campitella, Chrissie E. Campitella, Henry D. Gehlken, Sr., Vivian S. Gehlken, Kenneth W. Kelly and Anita B. Kelly, Stephen F. Linder, Sr., Jackie Bower Linder, and Kathryn A. McDaniel, appellants,

v.

Judson P. SMITH, Christy Brabham Bell, Charles S. Coleman, Jr., J. Thomas Coleman, Jacob C. Coleman, Valiska C. Freeman, George Arthur Stoudenmire, George Arthur Stoudenmire as trustee for the benefit of William E. Stoudenmire, Linda B. Stoudenmire, Stacey S. Dershaw f/k/a Stacy Mitchell Stoudenmire and Laura Brittany Stoudenmire, and Trust "B" Created by U/W Everett L. Stoudenmire and Valiska F. Coleman, respondents.

Appellate Case No. 2013–002727.

No. 5386.

Court of Appeals of South Carolina.

Heard Sept. 16, 2015.

Decided March 2, 2016.

Thomas Bailey Smith, of Smith Law Firm, PA, of Mount Pleasant, for appellants.

Harry Clayton Walker, Jr. and Thomas E. Andrews, III, both of Walker & Reibold, LLC, of Columbia, for respondents.

KONDUROS, J.

In this easement action, a group of homeowners contend the master-in-equity erred in finding (1) their easement was limited to ingress and egress and (2) the restrictive covenants do not apply to the Lake Access Lot. We affirm in part, reverse in part, and remand.

## FACTS/PROCEDURAL HISTORY

Charles S. Coleman, Sr. and E.L. Stoudenmire (Developers) developed Hilton Place subdivision in 1983. The Restrictions were filed on October 12, 1983. The Restrictions stated, "No lot or property conveyed hereunder shall be used for any other than private residential purposes of one family, except by and with written consent and approval of Grantors." Additionally, they stated, "No building, barn, outbuilding, fence, garage or structure of any kind or alterations or additions thereto shall be erected, placed or made on any lot hereby conveyed; no residence containing less than 1,200 square feet of living space shall be erected on any lot. . . ." The Restrictions also provided any lot or property conveyed could only be used for "private residential purposes of one family, except by and with written consent and approval of the Grantors." The Restrictions banned any "noxious or offensive activity" on the lots and anything that "becomes an annoyance or nuisance to the neighborhood." They likewise barred any "condition or situation" on any of the lots that was "a nuisance or otherwise detract[ed] from the desirability of the neighborhood as a residential section." Further, the Restrictions provided "[t]hese covenants, conditions and restrictions are for the benefit of the Grantors who may change or modify the terms contained herein at any time." The Restrictions also stated

they were "imposed upon all those lots shown on a plat ... dated September 19, 1983" (1983 Plat). The 1983 Plat shows several numbered lots and a lot with no number described as "Lake Access" (Lake Access Lot). The Developers never formed a homeowners' association although a group of homeowners attempted to form one at one point.

When Elizabeth Snow (f/k/a Elizabeth S. Bell) bought her lot in 1990, the deed stated, "Also conveyed her[e]with is an easement for the use and enjoyment by the lot owner and the lot owner[']s immediate family to the Lake Access Lot shown on the recorded subdivision lot, said easement to be appurtenant to the land her[e]in conveyed." Additionally, her purchase contract stated, "Lake Access Lot is available for purchaser's use at time of closing." Henry D. Gehlken, Sr. and Vivian Gehlken's deed stated the conveyance included "a nonexclusive access to the water of Lake Murray through the lake access as shown on [the 1983 P]lat[,] which shall run with the land." Other homeowners' deeds make no mention of lake or water access but do indicate they are subject to all easements of record.

A Confirmatory Amendment to the Restrictions was filed on February 5, 1999. It indicated the Restrictions only applied to the numbered lots. It also stated, "Nothing contained herein shall be construed to impose any covenants, conditions or restrictions on any other property shown on the aforesaid plat." The Amendment further provided, "In the event this amendment conflicts with any other provisions of the Restrictions ... this amendment shall supersede and govern."

In July 2010, the heirs [1] of the Developers deeded the Lake Access Lot to Judson P. Smith and Christy Brabham Bell (n/k/a Jennifer Christy Brabham) for $25,000. Smith and Bell built a dock, gazebo, fire pit, deck, and storage building containing a toilet [2] on the Lot. They also widened and lengthened the boat ramp.

---

1. Those heirs were Charles S. Coleman, Jr., J. Thomas Coleman, Jacob C. Coleman, Valiska (Sissy) C. Freeman, George Arthur Stoudenmire, George Arthur Stoudenmire as trustee for the benefit of William E. Stoudenmire, Linda B. Stoudenmire, Stacey S. Dershaw f/k/a Stacy Mitchell Stoudenmire, and Laura Brittany Stoudenmire (collectively, Heirs).

2. Appellants refer to this as an "outhouse."

Several homeowners [3] brought suit against Smith and Bell as well as the Heirs (collectively, Respondents) for declaratory judgments and breach of covenants. They also sought as to the Heirs to set aside the conveyance of the Lake Access Lot due to fraud, negligence, and breach of fiduciary duty.

At trial, Snow testified she interpreted her sales contract and deed as allowing her to use the entire Lake Access Lot at any time. Snow believed the outhouse on the Lake Access Lot negatively affected her property value because "it is an outhouse. It's a bathroom outside." She thought the outhouse diminished the value of her property by $25,000. She acknowledged the Lake Access Lot now being maintained instead of overgrown as it previously had been helped her property value. However, she stated her home value had decreased $19,000 since she refinanced her home in 2006.

Another owner, Stephen Linder, testified the outhouse decreased his property value by $10,000 to $25,000. He believed it was "a detriment to the neighborhood" "[b]ecause it's an outhouse where people go to the bathroom outside." Linder further indicated he could hear noise when Smith and Bell occasionally had parties on the Lot.

Kathryn Ann McDaniel, also a homeowner, testified once when she believed Smith and Bell were having a party, she had noticed an odor coming from the Lake Access Lot that smelled like an outhouse. She believed her property value had decreased by at least $20,000. She stated she had arrived at that figure "I guess probably just from what I think I would pay for something with an outhouse next door."

Homeowner Vivian Gehlken testified her property value had decreased $50,000 but she attributed that to the economy. However, she thought the outhouse had a negative effect on her property and the neighborhood. She provided she had not used the Lake Access Lot since Smith and Bell bought the Lot because it made her feel "uncomfortable."

Kenneth Kelly also testified as a property owner in the subdivision. He believed the outhouse and his believed loss of

---

3. These owners are Snow, Mark S. Campitella, Chrissie E. Campitella, the Gehlkens, Kenneth W. Kelly, Anita B. Kelly, Stephen F. Linder, Sr., Jackie Bower Linder, and Kathryn A. McDaniel (collectively, Appellants).

lake access had a negative effect on his property value in the amount of $20,000 to $25,000. Chrissie Campitella, another homeowner as well as a real estate broker, testified her property value had decreased by $25,000 because the outhouse was an eyesore. She also indicated she had seen the boat access ramp blocked about two to three times a month.

Bell testified she and Smith lived together in a house in the subdivision and had bought the Lake Access Lot together. She stated that when they bought the Lot, it was very overgrown and had a great deal of construction debris and trash on it. She provided they used a lot of heavy equipment to remove the debris. Bell considered the outhouse to be a bathroom because it was on a permitted septic tank. She indicated the South Carolina Department of Health and Environmental Control (DHEC) had issued the permit. She testified the Lot had electricity and currently had one television. She and Smith moved an additional, bigger television to the Lot for parties during football games.

Smith testified that although vehicles would be parked in the driveway of the Lake Access Lot from time to time, they did not block the access to the lake because one could easily go around them. He acknowledged the driveway had been blocked at times during the construction but it was now completed. He also provided he does leave his truck in the driveway while he is putting his boat in the water but moves it as soon as his boat is unloaded. He also indicated he parks his golf cart in the driveway while unloading supplies but moves it as soon as it is unloaded. He stated that when he and Bell bought the Lot, "it was a dump. You couldn't get to the water." Smith indicated the grass on the upper part of the Lot was cut but the lower part towards the water was not. He provided he had to bush hog the property to even get to the water. He also testified that after he had cleared all the debris off the Lot, they had to haul in large amounts of dirt. He indicated they brought in a gazebo and built a new deck, fire pit, and dock. He stated they had concrete poured to widen and lengthen the boat ramp because due to the water level, they could not launch a boat from it when they purchased the Lot. He testified it took three months to haul all of the debris away and all of the changes took two and half years to complete.

Smith also testified that after he and Bell bought the Lot, they discovered several sewer leaks on the Lot. Smith stated he fixed the leaking lines despite his belief it was actually the responsibility of the homeowner whose lines they were. He acknowledged the smell was "awful" while the lines were being fixed. He stated that since he had repaired the lines, he had not noticed any odors. He indicated his septic tank did not cause any odors and although he had not smelled anything, others could have broken lines on their property as he previously had on his. Smith also provided he and Bell's house was reappraised recently and the value had increased $15,000.

Freeman testified she was Developer Charles Coleman's daughter and had lived in the subdivision since 1988. She recalled a homeowners' association being formed by some of the residents of the subdivision but it disbanded once they realized they would have to pay property taxes on the Lake Access Lot. She testified the development of the Lake Access Lot had increased her property value because it looked better now than when it was overgrown.

The master found on behalf of the Respondents. It determined the Restrictions did not apply to the Lake Access Lot because they were meant to maintain certain standards for residences only. Additionally, it found the Amendment merely confirmed the original purpose and plain meaning of the parcel shown on the 1983 Plat. The master also determined Appellants had a right to use the driveway to the boat ramp as a pathway to and from the lake and nothing more. The master also found no fiduciary duty existed or was breached and no fraud was perpetrated.[4] Further, the master determined Appellants had not proved a diminution in value. This appeal followed.

## I. Limited to Ingress and Egress

Appellants contend the master erred in finding the easement over the Lake Access Lot is limited only to ingress and egress over the driveway/ramp. They assert the 1983 Plat does not indicate the easement is limited to a specific area on the Plat. They maintain the record contains no evidence the

---

4. Appellants do not challenge this ruling on appeal.

parties intended the easement to be limited to the driveway/ramp. We agree as to Snow and disagree as to the remaining Appellants.

An easement is a right to use the land of another for a specific purpose. *Windham v. Riddle,* 381 S.C. 192, 201, 672 S.E.2d 578, 582 (2009). This right of way over land may arise by grant,[5] from necessity, by prescription, or by implication by prior use. *Boyd v. Bellsouth Tel. Tel. Co.,* 369 S.C. 410, 416–17, 633 S.E.2d 136, 139 (2006); *Steele v. Williams,* 204 S.C. 124, 132, 28 S.E.2d 644, 647–48 (1944). "A grant of an easement is to be construed in accordance with the rules applied to deeds and other written instruments." *Binkley v. Rabon Creek Watershed Conservation Dist. of Fountain Inn,* 348 S.C. 58, 71, 558 S.E.2d 902, 909 (Ct.App.2001).

"[T]he determination of the scope of the easement is a question in equity." *Hardy v. Aiken,* 369 S.C. 160, 165, 631 S.E.2d 539, 541 (2006); *see also Eldridge v. City of Greenwood,* 331 S.C. 398, 416, 503 S.E.2d 191, 200 (Ct.App.1998) ("[T]he interpretation of a deed is an equitable matter."). On appeal in an action in equity tried by the master, "the appellate court has jurisdiction to find facts in accordance with its views of the preponderance of the evidence." *Campbell v. Carr,* 361 S.C. 258, 263, 603 S.E.2d 625, 627 (Ct.App.2004). Thus, this court may reverse a factual finding by the master in such cases when the appellant satisfies us the finding is against the greater weight of the evidence. *Id.* This broad scope of review does not require this court to disregard the findings of the master. *U.S. Bank Tr. Nat'l Ass'n v. Bell,* 385 S.C. 364, 373, 684 S.E.2d 199, 204 (Ct.App.2009). Nor are we required to ignore the fact the master, who saw and heard the witnesses, was in a better position to evaluate their credibility. *Ingram v. Kasey's Assocs.,* 340 S.C. 98, 105, 531 S.E.2d 287, 291 (2000). Furthermore, the appellant is not relieved of the burden of convincing this court the master committed error in its findings. *Pinckney v. Warren,* 344 S.C. 382, 387–88, 544 S.E.2d 620, 623 (2001).

---

5. "A reservation of an easement in a deed by which lands are conveyed is equivalent, for the purpose of the creation of the easement, to an express grant of the easement by the grantee of the lands." *Sandy Island Corp. v. Ragsdale,* 246 S.C. 414, 419, 143 S.E.2d 803, 806 (1965).

"[T]he determination of whether language in a deed is ambiguous is a question of law." *Proctor v. Steedley,* 398 S.C. 561, 573 n. 8, 730 S.E.2d 357, 363–64 n. 8 (Ct.App. 2012). "The language in a deed is ambiguous if it is reasonably susceptible to more than one interpretation." *Id.* When a deed is unambiguous, any attempt to determine the grantor's intent when reserving the easement must be limited to the deed itself, and using extrinsic evidence to contradict the plain language of the deed is improper. *See Springob v. Farrar,* 334 S.C. 585, 590, 514 S.E.2d 135, 138 (Ct.App.1999). "The determination of the grantor's intent when reviewing a clear and unambiguous deed is [also] a question of law for the court." *Proctor,* 398 S.C. at 573, 730 S.E.2d at 363. "[T]his [c]ourt reviews questions of law de novo." *Fields v. J. Haynes Waters Builders, Inc.,* 376 S.C. 545, 564, 658 S.E.2d 80, 90 (2008). "[A] reviewing court is free to decide questions of law with no particular deference to the [master]." *Hunt v. S.C. Forestry Comm'n,* 358 S.C. 564, 569, 595 S.E.2d 846, 848–49 (Ct.App.2004).

"[T]his court must construe unambiguous language in the grant of an easement according to the terms the parties have used." *Plott v. Justin Enters.,* 374 S.C. 504, 513–14, 649 S.E.2d 92, 96 (Ct.App.2007).

> In construing a deed, the intention of the grantor must be ascertained and effectuated, unless that intention contravenes some well settled rule of law or public policy. In determining the grantor's intent, the deed must be construed as a whole and effect given to every part if it can be done consistently with the law. The intention of the grantor must be found within the four corners of the deed.

*Proctor,* 398 S.C. at 573, 730 S.E.2d at 363 (emphasis omitted) (quoting *Windham v. Riddle,* 381 S.C. 192, 201, 672 S.E.2d 578, 582–83 (2009)). If this court decides the language in a deed is ambiguous, the determination of the grantor's intent then becomes a question of fact. *See id.* at 573 n. 8, 730 S.E.2d at 364 n. 8.

"An easement is a right which one person has to use the land of another for a specific purpose, and gives no title to the land on which the servitude is imposed." *Windham,* 381 S.C. at 201, 672 S.E.2d at 582 (quoting *Douglas v.*

*Med. Inv'rs, Inc.*, 256 S.C. 440, 445, 182 S.E.2d 720, 722 (1971)). Access is defined in Black's Law Dictionary as "[a] right, opportunity, or ability to enter, approach, [or] pass to and from ..." *Access,* Black's Law Dictionary (10th ed.2014). A lot is defined as "[a] tract of land, esp[ecially] one having specific boundaries or being used for a given purpose." *Lot,* Black's Law Dictionary (10th ed.2014). When language in a plat reflecting an easement is capable of more than one construction, the construction that least restricts the property will be adopted. *Tupper v. Dorchester Cty.*, 326 S.C. 318, 326, 487 S.E.2d 187, 191 (1997). "[T]he owner of the easement cannot materially increase the burden of the servient estate or impose thereon a new and additional burden." *Clemson Univ. v. First Provident Corp.*, 260 S.C. 640, 650, 197 S.E.2d 914, 919 (1973) (quoting 25 Am. Jur. 2d *Easements and Licenses,* § 72, page 478). Although the rights of the easement owner are paramount to those of the landowner as to the easement, the easement owner's rights are not absolute but are limited, so both the owners of the easement and the servient tenement may have reasonable enjoyment. *Id.* The owner of an easement has all rights incident or necessary to its proper enjoyment but nothing more. *Id.*

 The master erred in finding Snow was limited to ingress and egress to the lake. Snow's deed is clear; it specifically states she and her family have an easement for the use of the Lake Access Lot. This would require more than just using the Lot to get to the lake. The deed is not capable of any other interpretation. Nothing in the language of her deed limits her use only to access. However, her use of the Lot still must be limited to the least restrictive use and she only has rights incident or necessary to its proper enjoyment but nothing more. Because use is not defined, it must be interpreted as whatever least restricts the property owner. Accordingly, we reverse the master's decision that Snow's easement is limited to ingress and egress of the lake and remand to the master for a determination of Snow's rights in using the Lot.

 As to the Appellants other than Snow, the master did not err in finding the Lake Access Lot only provides ingress and egress on the driveway/ramp. The Gehlkens'

deed specifically grants them access to the lake and does not mention the use of the Lot. The other owners' deeds make no mention of an easement at all; they only reference the 1983 Plat, which shows the Lake Access.[6] Further, the Restrictions do not mention the Lake Access Lot. The Lot is described on the 1983 Plat solely as "Lake Access." Neither the Plat nor the Restrictions make reference to the Lot being a common area. To obtain access to the lake, Appellants only need to use the driveway/ramp. None of their deeds give them access to the use of the entire Lot as Snow's specifically does. Smith and Bell's buildings do not interfere with the homeowners access to the lake. Based on the testimony presented, the driveway only appears to occasionally be used by Smith and Bell. No evidence was presented Smith and Bell ever received a request to move a vehicle because it was blocking access. A vehicle could temporarily block the ramp even without Bell and Smith's ownership of the Lot because the Access is shared by many homeowners. Smith and Bell have actually made it much easier for Appellants to use the driveway because previously it was overgrown and the ramp was not long enough to use without damaging a boat. In keeping with the principle that an easement holder is only entitled to the use that least restricts the property, Appellants are not entitled to use the Lot other than to access the lake using the driveway and ramp. Accordingly, the master did not err in limiting the easement to ingress and egress to the lake for Appellants other than Snow.

## II. Restrictive Covenants

Appellants maintain the master erred in finding the restrictive covenants do not apply to the Lake Access Lot and therefore the improvements may stay. They argue the Restrictions state they apply to all lots on the 1983 Plat and the Lake Access Lot was one of the lots on the Plat. They contend the 1999 Confirmatory Amendment does not apply to the Lake Access Lot because it only applied to property that was not a

---

**6.** Respondents did not appeal, nor did they dispute at trial, Appellants are entitled to use the Lot to access the lake via the driveway/ramp. "[A]n unappealed ruling, right or wrong, is the law of the case." *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012).

part of Hilton Place subdivision and to property not divided into lots at the time of the Restrictions. We disagree.

"Restrictive covenants are construed like contracts and may give rise to actions for breach of contract." *Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp.,* 368 S.C. 342, 361, 628 S.E.2d 902, 913 (Ct.App.2006). "An action to construe a contract is an action at law reviewable under an 'any evidence' standard." *Pruitt v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n,* 343 S.C. 335, 339, 540 S.E.2d 843, 845 (2001). On appeal of an action at law tried without a jury, this court's review is limited to correction of errors of law. *Epworth Children's Home v. Beasley,* 365 S.C. 157, 164, 616 S.E.2d 710, 714 (2005). The master's findings are equivalent to a jury's findings in a law action. *King v. PYA/Monarch, Inc.,* 317 S.C. 385, 389, 453 S.E.2d 885, 888 (1995). "[Q]uestions regarding credibility and weight of the evidence are exclusively for the" master. *Sheek v. Crimestoppers Alarm Sys.,* 297 S.C. 375, 377, 377 S.E.2d 132, 133 (Ct.App.1989). "We must look at the evidence in the light most favorable to the respondents and eliminate from consideration all evidence to the contrary." *Id.*

"Words of a restrictive covenant will be given the common, ordinary meaning attributed to them at the time of their execution." *Taylor v. Lindsey,* 332 S.C. 1, 4, 498 S.E.2d 862, 863 (1998). "Restrictive covenants are contractual in nature, so that the paramount rule of construction is to ascertain and give effect to the intent of the parties as determined from the whole document." *Id.* at 4, 498 S.E.2d at 863–64 (quoting *Palmetto Dunes Resort v. Brown,* 287 S.C. 1, 6, 336 S.E.2d 15, 18 (Ct.App.1985)). When "the language imposing restrictions upon the use of property is unambiguous, the restrictions will be enforced according to their obvious meaning." *Shipyard Prop. Owners' Ass'n v. Mangiaracina,* 307 S.C. 299, 308, 414 S.E.2d 795, 801 (Ct.App.1992). "The court is without authority to consider parties' secret intentions, and therefore words cannot be read into a contract to impart an intent unexpressed when the contract was executed." *Pee Dee Stores, Inc. v. Doyle,* 381 S.C. 234, 241, 672 S.E.2d 799, 802 (Ct.App.2009).

 "Whether the language of a contract is ambiguous is a question of law for the court. A contract is ambiguous when the terms of the contract are reasonably susceptible to more than one interpretation." *Id.* at 242, 672 S.E.2d at 803 (citation omitted). "Once the court decides the language is ambiguous, evidence may be admitted to show the intent of the parties. The determination of the parties' intent is then a question of fact." *S.C. Dep't of Nat. Res. v. Town of McClellanville,* 345 S.C. 617, 623, 550 S.E.2d 299, 303 (2001) (citation omitted).

 "A restriction on the use of property must be created in express terms or by plain and unmistakable implication, and all such restrictions are to be strictly construed, with all doubts resolved in favor of the free use of property." *Taylor,* 332 S.C. at 5, 498 S.E.2d at 864 (quoting *Hamilton v. CCM, Inc.,* 274 S.C. 152, 157, 263 S.E.2d 378, 380 (1980)). "Restrictions on the use of property will be strictly construed with all doubts resolved in favor of free use of the property, although the rule of strict construction should not be used to defeat the plain and obvious purpose of the restrictive covenant." *Seabrook Island Prop. Owners Ass'n v. Marshland Tr., Inc.,* 358 S.C. 655, 662, 596 S.E.2d 380, 383 (Ct.App.2004).

 "[A] developer may generally reserve to himself the right to amend restrictive covenants in his sole discretion, and may do so without the consent of the grantee, so long as he exercises that right in a reasonable manner." *Queen's Grant II Horizontal Prop. Regime,* 368 S.C. at 362, 628 S.E.2d at 913.

[A] developer may reserve to himself, in his sole discretion, the right to amend restrictive covenants running with the land or impose new restrictive covenants running with the land, provided five conditions are met: (1) the right to amend the covenants or impose new covenants must be unambiguously set forth in the original declaration of covenants; (2) the developer, at the time of the amended or new covenants, must possess a sufficient property interest in the development; (3) the developer must strictly comply with the amendment procedure as set forth in the declaration of covenants; (4) the developer must provide notice of amended or new covenants in strict accordance with the declara-

tion of covenants and as otherwise may be provided by law; and (5) the amended or new covenants must not be unreasonable, indefinite, or contravene public policy. *Id.* at 350, 628 S.E.2d at 907.

An action seeking an injunction to enforce restrictive covenants sounds in equity. *Santoro v. Schulthess*, 384 S.C. 250, 261, 681 S.E.2d 897, 902 (Ct.App.2009). "[U]pon a finding that a restrictive covenant has been violated, a court may not enforce the restrictive covenant as a matter of law. Rather, the court must consider equitable doctrines asserted by a party when deciding whether to enforce the covenant." *Buffington v. T.O.E. Enters.*, 383 S.C. 388, 394, 680 S.E.2d 289, 292 (2009).

Viewing the Restrictions alone, whether they apply to the Lake Access Lot is unclear. They state they apply to "all lots hereinafter designated" and "all those lots shown on [the 1983 Plat]." On the Plat, it does appear the "Lake Access," as the Plat calls it, is different from the other lots, which are numbered, but otherwise looks like a lot on the Plat. The Restrictions reference things relevant to residences, such as the minimum size of a house and where trash cans must be placed in reference to a house. Accordingly, the Restrictions are ambiguous as to whether the terms provided by them apply to the Lake Access Lot. However, the master did not find them to be ambiguous. Looking outside the Restrictions because we find them ambiguous, the record contains no evidence the Grantors ever intended for the Lake Access Lot to be a residential lot. If a home was built on the Lot in accordance with the provisions in the Restrictions, using the access could be more difficult for the other homeowners than it is currently. One of the Heirs testified the Lake Access had no restrictions on it. Another of the Heirs testified her father, one of the Grantors, intended for the Lake Access to provide the homeowners with access to the lake. She also testified the Heirs informed Smith and Bell they could build structures on the Lake Access Lot.

As noted by the master, restrictions on the use of property must be created in express terms or by plain and unmistakable implication, and restrictions will be strictly construed with all doubts resolved in favor of free use of the property.

Accordingly, because whether the Restrictions apply to the Lake Access is unclear, we construe the Restrictions in favor of allowing Smith and Bell to have the gazebo, building, fire pit, and deck on the Lake Access Lot.

Additionally, the Amendment was valid. The Grantors reserved the right to amend in the Restrictions and stated that right was for their benefit and they could do so at any time. The Amendment met the requirements in *Queen's Grant* to allow the amending of restrictive covenants. 368 S.C. at 350, 628 S.E.2d at 907. The Amendment was reasonable. The Grantors still owned property in the subdivision at the time, including the Lake Access Lot. The Restrictions specifically reserved the right for the Grantors to modify the Restrictions. The Restrictions did not require a specific procedure for the Grantors to follow when amending the Restrictions or require that notice be given to homeowners. The Amendments are clear the Restrictions only applied to numbered lots and the Lake Access Lot was not numbered. Accordingly, the master did not err in finding the Restrictions did not apply to the Lake Access Lot.[7]

## CONCLUSION

The master erred in finding Snow's easement was limited to ingress and egress of the lake. Accordingly, we reverse that finding and remand for the master to determine the extent of Snow's use of the Lake Access Lot. However, we affirm the master's finding the Lot is only for Appellants to use the driveway/ramp for ingress and egress. Further, the master

---

7. Appellants also assert the master erred in finding the Lake Access Lot had been improved. Because they provide no citations or legal authority for this argument, this argument is abandoned. *See State v. Lindsey*, 394 S.C. 354, 363, 714 S.E.2d 554, 558 (Ct.App.2011) (finding that when a party provides no legal authority regarding a particular argument, the argument is abandoned and the court will not address the merits of the issue); *Bryson v. Bryson*, 378 S.C. 502, 510, 662 S.E.2d 611, 615 (Ct.App.2008) ("An issue is deemed abandoned and will not be considered on appeal if the argument is raised in a brief but not supported by authority."); *Glasscock, Inc. v. U.S. Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 691 (Ct.App.2001) ("[S]hort, conclusory statements made without supporting authority are deemed abandoned on appeal and therefore not presented for review.").

did not err in finding the Restrictions did not apply to the Lot. Therefore, the master's order is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

FEW, C.J., and LOCKEMY, J., concur.